We'll go to the next matter. U.S. v. Zepeda-Orozco-Huberto. Go ahead. Thank you. Good morning, Your Honors. May it please the Court, Marnie Jimenez, Federal Defenders of San Diego, on behalf of Mr. Zepeda-Orozco. The question that this case presents is, does a censor alert allow the Border Patrol to stop any truck, van, or SUV on a California highway? We contend that it does not. Now, whereas Cortez instructs that a particularized and objective basis must exist for law enforcement to have reasonable suspicion to stop a motorist, the facts of this case represent the kind of impulsive and uninformed actions by law enforcement that cases like Terry and Diaz-Juarez sought specifically to prevent. Because the government cannot point to any particularized or objective specific reason for the stop of my client, Mr. Zepeda, this Court must reverse. Now, first of all, I'd like to point out that under the law of the case doctrine, as pointed out by my briefs, and under this Court's decision in Alexander, that there was no basis for the district court to reverse itself in the first place. We contend that the district court had it right in suppressing the evidence because it found that there was not the particularized and objective basis for stopping my client. Now, as this Court found in Alexander, there is no permissible reversal for clear error if it is plausible in light of the record viewed in its entirety that the district court had it right in the first time. The district court did not review any new evidence when it reversed its ruling to suppress. What the government here tried to do was re-litigate the exact same facts and have the district court reverse itself on nothing new. There was no clear error, and the fact that the district court ruled for my client in the first place indicates that there was plenty of reasonable suspicion or that there was not reasonable suspicion in the first place. But wasn't the problem that in the first hearing the judge was somewhat confused about the timeframe? I'm sorry, Your Honor. I'm having trouble hearing you. Was the problem that he was somewhat confused in the first instance about the timeframe? Your Honor, I don't believe that the district court was confused. I feel that the district court had in front of it the timeframe that it would suggest is not suggested by the record as clearly as the government intends to make out. In fact, the declaration filed by the Border Patrol agent that was filed in support of this timeline uses words such as approximately twice. The government throughout its brief states that it was approximate that my client was stopped at 12 o'clock, that the agents reached the Caltrans construction site within approximately 10 minutes. And the government relies heavily on this constructed timeline, which we would say is not as clear as the government would depict. But the first time it was operating from Aronia's premises that led him to believe that it was about an hour, actually. That's correct, Your Honor, it was. And in fact, the government stated at the September 15th hearing that my client was arrested at about 1 o'clock when the sensor alert supposedly went off at about 12 o'clock. And so, although government counsel contended that the 1 o'clock timeframe was a bookend, we're still going by the government's contention, looking at a timeframe of about an hour. And clearly... This is only close to the Alexander question, which I... But the judge essentially decided was that he didn't realize that that was the time of arrest. He had passed, you know, the time when they came upon him at the construction site with operating on an Aronia's premise, and he decided it was the first time. Your Honor, that's... What the district court decided was that looking at the record a little more carefully, according to the government's testimony, he found more swiftly than he originally believed. What we think, Your Honor, is that regardless, there is not reasonable suspicion in the record in order to stop my client. Now, what the government has here is a person who is driving a car who is capable of crossing the desert in that car. Now, there's nothing particularized about that. And in fact, as Agent Embry stated when he testified before the district court, he said that he approached my client for that reason. And on page 31 of the excerpt of record, he says, I came upon the construction site. I pulled alongside his vehicle and stopped, because that was the only vehicle, or that was the only one that I could conceive of going through the desert. And that was in response to my question, you approached Mr. Zepeda's car because that was the only one you thought could have crossed the desert. And he did not have anything more than that. What the government would like to argue now is that because my client was located near a certain point in the desert, he was the one who triggered the sensor, and that because he was driving a car that was capable of driving through the desert, that the obvious inference is that he was the one that triggered the sensor, which we do not think that the record supports in any way. In fact, what Agent Embry should have done was develop a more particularized investigation of whether my client was the individual who tripped the sensor. He did not consider how clean my client's car was. He did not consider that we did not know how far Agent Station to the east were from the Caltrans site. We don't know whether they saw any other vehicles during the time that he was speaking to my client or even after that. So the fact that he simply was at a Caltrans site within a few miles of the sensor does not give the Border Patrol the sort of particularized objective basis that they need in order to stop him. In fact, he should have also considered the fact that there was no description whatsoever of the vehicle he was looking for, and that... Yes, there definitely was a stop, Your Honor, and we contend that he was stopped at the very moment that Agent Endres pulled up next to him, effectively blocking any form of egress that my client might have previously had. And Agent Endres may not have been able to stop my client because he thought that my client was the individual who tripped the sensor only because he was driving a truck. There is a stop, clearly, Your Honor, because at the moment that Agent Endres pulled up alongside of my client, he could not go anywhere. He could not leave the scene. He was confronted by a marked Border Patrol vehicle driven by an armed, uniformed... Well, what's odd about this case, and what's different from the side-of-the-road cases, is that your client was already stopped, not just stopped, but impeded. He couldn't go forward, and he couldn't go forward not because the police were stopping him, but because the construction crew and the cars were stopping him. So he was not going where he wanted to go anyway, and wasn't able to before the guy ever got to him. Well, that may be true, Your Honor, but I think that the Court needs only look to cases like Chavez Venezuela and Carr in order to find that this was indeed a stop. In Chavez Venezuela, as Your Honor knows, the motorist there was stopped at the side of the road, and was actually having motorist problems with his motor when the Border Patrol agent pulled up behind him. So this is an individual who's already stopped, and this Court found that there was a stop in that case because that individual was not free to leave, as my client was not free to leave. In Carr, what this Court relied upon to deem that was a stop was the fact that the officer was not free to leave. The officer effectively blocked in Mr. Carr, even though he was at his own residence, and that Mr. Carr left his vehicle and approached the officer when the officer blocked him in in his own driveway. I think that looking at the facts in this case, it's quite clear. I think the reason is because he was on that side of the car. Somehow he had stopped in the back, for example, of the support cars, and just leaned in and said, I want to talk to you, that it would have been a stop. No, Your Honor, I would not agree with that position. I think that we have to consider the setting in which Mr. Zepeda was stopped, and I think Chastanet instructs us that the setting is very important. My client's in a rural area. He couldn't – there was nowhere for him to go. It's not like he was stopped in San Diego where he could have left, caught a bus, caught a taxi. He's in a rural area. He's stuck at the Caltrans stop, and he's effectively blocked by the agent, and he cannot drive anywhere. He – the fact that the agent stops directly next to him, regardless of the fact that he approached him from which window, I think is irrelevant, is that under the perception of my client, he would not have felt free to leave or ignore the officer. And I'd like to – Well, you're probably right, but it's also true in the bus cases and so on. I mean, the trouble with these cases is that they're fairly cynical, to put it mildly, and therefore it's hard to reason within them. It's hard to see why he was forced out from the people in the bus. That's the problem. I'm sorry, Your Honor. Anyway, go ahead. He said you wanted to reserve your last 30 seconds. I would like to reserve the balance of my time. Thank you. May it please the Court, good morning, Governor Rhoads of the United States. To address first the question of whether or not the rule of the case applies, the government's position is it does not under Alexander. The government argued that there was clear error in the factual findings that the Court made the first time. The Court itself recognized that in the rehearing, and I specifically refer to supplemental excerpts of record 102 through 108, there the Court, at least three separate times, said that it erred specifically by overlooking the timing. The timing specifically referring to the time the sensor went off at noon, the report went over the radio one minute later. Agent Palmer was at the top of Roy's Road ten minutes after the radio report. And it was two minutes further down Highway 98 to the construction site. So as the Court said specifically in those SER pages that I cited, it was a maximum, and the Court uses various different minutes. I don't think it comes down to a stopwatch. But between 10 and 15 minutes, he says at one point, and if you added up more precisely the precise minutes in the testimony, it's 13 minutes. But the point is this. That's 13 minutes from the time the sensor went off until the time the agent is approaching the defendant at the construction site. The agents were actually closer behind the defendant, because obviously it would have taken the defendant some minutes to traverse those same four miles. The testimony, and the Court, you know, estimates, you know, at the very least, it would have taken the defendant himself five minutes to travel those four miles, because Roy's Road is a sand road, because it's two and a half miles long, and then it would be another two miles to the construction site. So we have a situation here where the agents are only they're responding within 13 minutes, and they're, you know, fewer minutes than that behind the defendant. The error, and I can clearly point this out, is page 67 of the excerpts of record and referring to the Court's order, and the framework that the Court was working with originally was sometime the tracks were made sometime that morning within a matter of hours, and the excerpt pages that I just cited make it clear that it's really a matter of minutes, not hours. There's other factual errors that the Court made, but that's the critical one relating to timing, and it was the government's fault. The government did not connect the evidentiary dots for the Court, and that's specifically how the Court put it, page 102, 103. The evidence was in there. The government didn't skillfully connect the dots and show that it was minutes, not hours, that the framework should have been dealing with. So we have here a case. Roberts. So you would say even if Alexander really is the law of the circuit, it would come under its manifest injustice. Under the clear error, clear factual error and manifest injustice. I'll move on. One small point. I also think that there was legal error. The Court repeatedly referred to it was conceivable that the car had gotten away. It was conceivable that the car had left the area by the time the agents approached. And whether or not something is conceivable or not isn't the reasonable suspicion  The government doesn't have to disprove every other factual option. So there was also legal error. The Court didn't address that on the factual error as clearly sufficient. Alexander doesn't control and didn't preclude the factual findings as made by the Court the second time around. Those findings are reviewed only for clear error and must be accepted unless clearly erroneous. Before I go directly to the reasonable suspicion argument, I'd like to address the preliminary question of whether or not there was a stop. There was no stop in the Fourth Amendment sense in this case. And the reason is there was no physical stop of ongoing movement, there was no detention by law enforcement, and there was no coercion by law enforcement. I'd like to start by differentiating the defendants' cases, specifically Chan-Gimenez, and I think that that's the case that counsel meant to cite. Chan-Gimenez is the case that defense counsel, the appellant, relies on primarily in his brief. Because it's a roadside stop, the agent pulls up, his emergency lights are on, and there is an encounter at the side of the road. The only fair reading of that case is that it turns on two facts. Specifically, the court says that a seizure occurred when and because of the fact that the law enforcement officer asked for the registration, asked for the driver's license, and kept it. Kept it throughout the interview, did not give it back when it checked out. And the second pivotal fact is that the law enforcement officer had his hand on his holstered weapon throughout the entire time of the encounter. Those two facts are mentioned repeatedly within the very brief analysis, and the language that is used is specifically when a seizure occurred, when the documents were obtained and were not returned. And again, by doing so, meaning retaining the documents, the officer seized the defendant. Because no motorist can leave without his registration, without his license. In addition, the motorist would have felt compelled and coerced by the fact that the hand was at all times on the weapon. That case is just not this case. The uncontroverted testimony was that the weapons were holstered at all times. They were never brandished. Their hand was never put on them. And the documents were never kept. That is sufficient to distinguish John Jimenez. Instead, the government's cases are the cases that control this case, specifically Judge and Kim, which specifically hold that when there's no physical stop, as in stopping somebody who's already moving about, that there is no Fourth Amendment detention. Again, there's no Fourth Amendment stop. There's no detention under the two bus cases, specifically Drayton and Bostic. And again, under Delgado. In those cases, and the partial blocking or the blocking of the vehicle doesn't change that fact. When somebody is not already milling about in society, the Bostic and Drayton make it very clear the free-to-leave test is inappropriate. Bostic simply says that makes absolutely no sense at all because the person is not going anywhere anyway. The defendant here wasn't going anywhere. He was sitting in traffic with every other car stopped by the flagman. Breyer. He asked him a question whether what he would have had to do to leave, if he wanted to leave, and he, because of where the police car, where the agent's car was at that point, he could not have left him in automobile. Although he could have before the agent got there. Right. He couldn't have left, and that's why free-to-leave is not the test. Drayton says the test is whether or not he felt free to terminate the encounter. And here the specific questions as to whether or not the defendant did anything to terminate the encounter. Did he try to wave you off? No. Did he do anything to indicate he didn't want to talk? No. Those are on Excerpt of Record, page 19. And it's significant here that he didn't roll up the window. The window was already down. He didn't wave him off. He didn't say I prefer not to talk. He didn't just simply ignore him. He conversed. And Delgado specifically says that questioning alone, it's very unlikely that questioning alone is ever going to result in a Fourth Amendment violation. It takes more than walking up to somebody in broad daylight on a public highway with observers all around, the flagman, the other people in the cars, to make this a coercive setting. Drayton specifically says the uniform doesn't do it. The holstered gun doesn't do it. It must be brandished. And the marked car doesn't do it. These the fact that cops have marked cars and uniforms and guns is something every person knows. What is the statute of review at this point? The judge found not once but twice that there was a stop. So what do we do with that? It is a de novo. And the government believes that the Court should consider that de novo and find that there was no stop because of the Supreme Court cases that I'm citing. Really, it only comes down to the emergency light. And the emergency lights in this context are not coercive. And here's why. Because the test is a reasonable, innocent person. A reasonable, innocent person in this context isn't going to feel that they're being apprehended by emergency lights when there's no siren, no command. Everything is request. Everything is informal. And this is a two-lane highway. The testimony is that the officer is coming along the two-way highway. He's looking at the cars. He goes there specifically to see if he's caught in traffic. And he looks at the cars. He stops. He walks up. And the emergency lights were a safety measure. That may be what the police and what the agent thought, but it isn't necessarily what the defendant thought. It's what a reasonable, innocent defendant would think, given that the officer is driving on the wrong side of the traffic. A reasonable, innocent defendant might first start wondering why the agent is driving on the wrong side of the traffic if there isn't something serious going on. Well, there was, I mean, under that scenario, then every single person at the entire construction site would have felt seized.  Then when you pull up right next to this car and see the ability of the car to turn around, which has to at least be relevant to the inquiry, and then flashlights as well, I dare say that most people would think I better answer this question. Well, when he walked up to the car, that was the first time the flashing lights had any focused attention on the defendant. And given the encounter and the fact that there were no commands and no brandishing of a weapon, it's the government's position that the lights alone don't make it coercive, and the government would use Chesternaught as its watermark on that. Chesternaught involved four officers in a marked vehicle driving along the road, paralleling a defendant who was running along the sidewalk, and the court found that that defendant would not feel coerced and would feel free to go about his own business. I guess the question is whether, going back to him and us, it's true that he didn't have the lights, but he was in a physical position that was more assertive than in him. And as a wife, the one that substituted for the other. A physical position? Physical position, i.e., directly next to him in a way that made it impossible for him to turn around. Well, you know, he was alongside the car. Right. And the point isn't whether he could leave. Well, I understand that, but it's relevant that he was in a physical position that made it difficult for him to leave. That certainly has something to do with whether somebody would think that he, just as the guy, I mean, somebody can drive away without his license, I suppose, even though it's illegal, or can think that it's not relevant that the guy still has his license. But in this instance, the fact that the guy is sitting there right in a spot in which he would otherwise be able to turn around may have something to do with whether he thinks this is an assertion of authority or not. Well, he wasn't in a position to leave. He wasn't in a position to terminate, which he could have done by any means, rolling up the window, waving him off, saying, no, I don't want to talk, ignoring him, turning his back. And because he didn't do any of those very, very easy things, it's completely speculative to think that but for the officer's car, he would have pulled a U-turn and driven off, that there's just nothing in the record that justifies that exception when he didn't use any readily available means to terminate a simple conversation. Finally, unreasonable suspicion, I'll rely on the facts I've already laid out. Counsel, you're already way over your time. We've got our blinking red light here. Thank you. I'll give you a minute for rebuttal. Thank you very much, Your Honor. Your Honor, I just have a couple of two primary points that I would like to make. First, I think that rather than looking at what my client could have done to terminate the interaction, we need to look at the agent's conduct and how that affected my client. It was because of the agent's client in this rural or the agent's conduct in this rural setting, blocking in my client, that he did not feel free to leave. And under Kim and Judge, both of those defendants in those two cases had the means to leave, that my client did not, because he was effectively blocked in by Agent Endres' conduct. Second, I'd like to make the point that, and this is indicated on page 2 in 67 in the excerpt of record, that Caltrans was stopping traffic in 15-minute increments. So the government's own position that this supposedly happened, this interaction happened 13 minutes after the sensor alert was triggered, is self-defeating, because Agent Endres was aware of this fact. If he thinks that he got to the Caltrans stop 13 minutes after the sensor was tripped, then cars were only waiting for approximately 2 minutes at the Caltrans site. So easily, any number of vehicles that were also capable of crossing the desert could have already passed through the Caltrans site. By the government's reasoning – Well, that doesn't make any sense. We have no idea where it was within the 15-minute interval that he got there. I mean, I thought you were going to say the opposite, that it could have been 27 minutes. I mean, we don't know. That's true, Your Honor. I guess the point that I'm trying to make is that when Agent Endres approaches the Caltrans site, and he – initially, he thinks he's going to drive right through the Caltrans site. He doesn't think that the car that he's looking for is stopped there. And he thinks that the cars actually passed through, even knowing that Caltrans was stopping traffic regularly. What I'm saying is that very clearly, cars could have passed through the Caltrans site that could have fit the very vague description that he was seeking out before he even reached it, and that he was aware of that. By the government's reasoning, it didn't. But there were officers on the other side of the construction. That's true, Your Honor. However, there was no testimony as to how far away those officers were. They could have been miles away. We don't know that. And there was nothing specific revealed at the hearing as to where those officers  So the fact that they hadn't seen any cars pass by really does not give us any information that we're looking for. When the officers turned off of Roy's Road, made a right turn on Highway 98, I thought I remember they observed old tire marks, the dirt. That's true, Your Honor. They did observe a tire track. But there was no relationship between that tire mark and the tread on my client's car. We also don't know whether anyone had done a U-turn in that area. That area was not monitored, and that was revealed at the hearing, that that particular area, that particular part of Roy's Road had not been monitored that morning. I think what's important to keep in mind that the government would like to urge upon this Court that an entire category of people, those who are driving cars that could traverse the desert, should be, that law enforcement should be allowed to stop that broad category of people just because they live in an area that is a high-crime area close to the border. And that is a profile that Stigman v. Estera specifically precludes the government to categorize. Thank you. Thank you. We'll take a ten-minute recess at this time.
judges: Pregerson, Fernandez, Berzon